| DISTRICT COURT, COUNTY OF BOULDER, COLORADO<br>1777 6th Street<br>Boulder, Colorado 80302 | DATE FILED: November 21, 2018 3:50 PM<br>FILING ID: 8DEAE9F2BD2C6<br>CASE NUMBER: 2018CV31084 |
|---|---|
| **Plaintiff:** COMCAST OF COLORADO I, LLC, a Colorado limited liability corporation<br><br>v.<br><br>**Defendants:** ANDREW J. O'CONNOR, an individual, and MARY E. HENRY, an individual | ▲   COURT USE ONLY   ▲ |
| **Attorneys for Plaintiff Comcast of Colorado I, LLC**<br>David M. Stauss, #40769<br>J. Matthew Thornton, #48803<br>Ballard Spahr LLP<br>1225 17th Street, Suite 2300<br>Denver, Colorado 80202-5596<br>Telephone: (303) 292-2400<br>Facsimile: (303) 296-3956<br>Email: staussd@ballardspahr.com<br>Email: thorntonj@ballardspahr.com | Case No.:<br><br>Courtroom: |
| **VERIFIED COMPLAINT** ||

Plaintiff Comcast of Colorado I, LLC ("Comcast"), by and through its attorneys, hereby submits the following Verified Complaint against Defendants Andrew J. O'Connor and Mary E. Henry and alleges as follows:

## JURISDICTION AND VENUE

1. Comcast is a Colorado limited liability company with its principal office located at 1701 John F. Kennedy Boulevard, Philadelphia, Pennsylvania 19103-2838.

2. Defendants reside in Boulder County.

3. Venue is proper in the District Court of Boulder County under C.R.C.P. 98 because the subject of the action is situated in Boulder County.

4. The Court has jurisdiction over this action pursuant to C.R.S. § 13-1-124 because the action arises from the ownership, use, or possession of real property situated in this state.

# GENERAL ALLEGATIONS

5. Mr. O'Connor resides at 1220 Devonshire Court, Lafayette, Colorado 80026 (the "Property").

6. The Property is owned by Mary E. Henry who, based on information and belief, is Mr. O'Connor's wife.

7. The Property is located in the Churchill Pointe Subdivision. *See* Ex. 1 (Churchill Pointe Subdivision Filing 1 Plat, Page 2 of 2).

8. In 1983, the Churchill Pointe Subdivision "grant[ed] to the City of Lafayette, State of Colorado, for the perpetual use by the public, the streets, easements and tracts" shown or described in the Churchill Pointe Subdivision Final Plat (the "Final Plat"). *See* Ex. 2 (Dedication, Churchill Pointe Subdivision Filing 1 Final Plat, Page 1 of 2).

9. As set forth in the Final Plat, each lot in the Churchill Pointe Subdivision has "a five foot utility easement along the rear lot line, and five foot easement along the side lot lines when shown." *See id.*

10. As illustrated in Table 1, the Final Plat shows a five foot easement along the Property's rear lot line and side lot line (the "Easement"). *See* Ex. 1 (highlights added). Defendants live on the parcel shaded grey, and the area shaded green is the five foot easement running along the Property.

Table 1: The Easement



**Comcast Holds a Cable Franchise from the City of Lafayette**

5.  Cable companies like Comcast are required by federal law to obtain cable franchises from municipalities for permission to operate a cable system. Section 621(a)(2) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 541(a)(2) ("Cable Act"), states in pertinent part:

> (2) Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which are within the area to be served by the cable system and which have been dedicated for compatible uses, except that in using such easements the cable operator shall ensure –
>
> (A) that the safety, functioning, and appearance of the property and the convenience and safety of other persons not be adversely affected by the installation or construction of facilities necessary for a cable system;
>
> (B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both; and
>
> (C) that the owner of the property be justly compensated by the cable operator for any damages by the installation, construction, operation, or removal of such facilities by the cable operator.

6.  The Cable Act defines "franchise" as "an initial authorization, or renewal thereof . . . issued by a franchising authority, whether such authorization is designated as a franchise, permit, license, resolution, contract, certificate, agreement, or otherwise, which authorizes the construction or operation of a cable system."

7.  Comcast and its predecessors-in-interest have held a cable franchise granted by the City of Lafayette since at least February 1, 1983. The cable franchise was renewed in 2001.

8.  On December 16, 2016, the City of Lafayette (the "City") and Comcast again renewed the Cable Franchise Agreement (the "Agreement"). *See* Ex. 3 (Cable Franchise Agreement).

9.  The Agreement authorizes Comcast to access "Rights-of-Way" located in the City to "erect, install, construct, replace, reconstruct, and retain in, on, over, under, upon, across, and along the Rights-of-Way within the City such wires, cables, conductors, ducts, conduits, vaults, manholes, amplifiers, pedestals, attachments and other property and equipment as are necessary to the operation of a Cable System within the City." *See* Agreement §§ 1.36, 2.1, 2.2.

10. The term "Rights-of-Way" includes any easement that has been established within City limits. *Id.* § 1.36.

3

11. In addition to authorizing access to Rights-of-Way within the City, the Agreement also codifies Comcast's *right* to "perform all construction in the Rights-of-Way." *See id.* § 10.1.

12. To access the Rights-of-Way, Comcast must first "give notice to private property owners of work on or adjacent to private property in accordance with City's Customer Service Standards[.]" *Id.* § 10.13. The City's Customer Service Standards require Comcast to provide "reasonable notice" prior to entering upon private premises, with a description of the work to be performed. *Id.*, Exhibit A § 33.3(c)(7)(iii).

13. The Agreement does not require Comcast to obtain permission from the property owners or tenants prior to accessing Rights-of-Way, even if located on private property. *See generally* Agreement.

**The City Notifies Residents of Comcast's Advanced Fiber Network Project**

14. In or around mid-2018, the City notified its residents of Comcast's plan to launch an "Advanced Fiber Network Project" (the "Project"), starting in late July 2018 and scheduled to end in early November 2018. CITY OF LAFAYETTE, *Comcast Advanced Fiber Network Project*, https://www.cityoflafayette.com/2190/Comcast-Advanced-Fiber-Network-Project (last visited Nov. 19, 2018). As noted by the City, Comcast designed the Project to "bring fiber optic infrastructure deeper into Lafayette neighborhoods which will expand Comcast's broadband capacity throughout the City, further increase its network reliability, and support next-generation speeds for Lafayette residents and businesses." *Id.*

15. The City advised residents that the Project would involve "a combination of construction in the public right-of-way and public utility easements, installation of new and upgraded equipment and changes to the network architecture" and made it clear that residents are "legally required" to allow 24-hour access to public right-of-ways and public utility easements if located on their properties and to "expect construction crews in the neighborhoods working in both front, side and backyards." *Id.* Property owners with pets were specifically asked to "make sure [their] pets are safe and secure during the window provided by Comcast." *Id.*

**Defendants Block Comcast's Access the Easement**

16. On October 17, 2018 – several days after Comcast representatives hung a door tag on the Property providing notice that it would need access to the Easement – workers knocked on Defendants' door and politely asked to be let into the backyard.

17. Mr. O'Connor refused to provide access.

18. Later that day, a supervisor approached Mr. O'Connor and again asked for access to the Easement. Mr. O'Connor again refused.

19. As the supervisor and workers began leaving the Property, Mr. O'Connor got into his truck, pulled out of his driveway, and accelerated up onto the sidewalk where a Comcast

4

representative was walking back to his vehicle. The worker, an older gentlemen, was not injured during the incident, but he was visibly upset and shaken up by it.

20. Comcast later received reports that Mr. O'Conner had threatened to shoot anyone who ventured on his Property without permission.

21. To avoid further escalating the situation with Mr. O'Connor and to ensure the safety of its workers, Comcast representatives requested that the Lafayette Police Department accompany Comcast representatives who were attempting to gain access to the Easement.

22. The Lafayette Police Department (who, incidentally, agreed that Comcast has a right to access the Easement) explained to Mr. O'Connor that Comcast had an easement on the Property and that he needed to allow them access to it. Mr. O'Connor continued to refuse access to the Easement.

23. On October 18, 2018, Mr. O'Connor posted a sign on the front door of the Property with his and his wife's signature, stating: "Access denied to our property or backyard at 1220 W. Devonshire Ct. Lafayette, CO 80026."

**Defendants Demand Comcast Pay $10,066 to Access the Easement**

24. On October 21, 2018, Mr. O'Connor sent an email to Comcast (as well as a select number of public officials and media outlets) seeking $10,066.17 in damages for alleged "harassment, filing a false police report and trespass to private property and injuries to dog." *See* Ex. 4 (Oct. 21 O'Connor Email). Much of Mr. O'Connor's email is fantastical, but parts of it confirm important details about the October 17 incident and Mr. O'Connor's actions in the days that followed, including that:

- Comcast representatives made numerous requests to access the Easement, all of which Mr. O'Connor rebuffed;

- Mr. O'Connor locked the gate to his backyard to prevent Comcast representatives from accessing the Easement;

- Mr. O'Connor used his dog and a "Beware of Dog" sign to intimidate and deter Comcast representatives from accessing the Easement;

- Mr. O'Connor demanded money from Comcast for access to the Easement, starting at $1,000 and increasing to over $10,000;

- Mr. O'Connor is denying Comcast access to the Easement, at least in part, because he mistakenly believes that Comcast does not have an easement on the Property;

- Mr. O'Connor mistakenly believes that, even if Comcast has an easement, he has the right to deny them access to it;

5

- Comcast appropriately escalated the situation, first by having supervisors speak with Mr. O'Connor, and then, after being denied access to the Easement numerous times, contacting the Lafayette Police Department, whose instruction to allow Comcast access to the Easement Mr. O'Connor ignored; and

- Mr. O'Connor believes that the issue of whether Comcast has an easement should be decided by a court.

*Id.*

25. On October 22, 2018, Mr. O'Connor sent an identical message to Comcast's Legal Division, this time by letter. *See* Ex. 5 (Oct. 22 O'Connor Letter).

26. On October 22, 2018, Daniel Grisim, a Senior Manager for Security at Comcast, emailed Mr. O'Connor about his complaint, asking for an opportunity to discuss the alleged incident with him. *See* Ex. 6 (Oct. 22 Email from Grisim to O'Connor).

27. Mr. O'Connor declined Mr. Grisim's request and instead reiterated his demand for Comcast to pay him $10,066.17, stating that, if Mr. Grisim "[did] not have settlement authority to pay me $10,066.17 then we will have no further communications." *Id.*

28. Mr. Grisim tried contacting Mr. O'Connor once more, to explain the reasons Comcast needed access to the Property, which include addressing service issues of Mr. O'Connor's surrounding neighbors, but Mr. O'Connor asked Mr. Grisim not to contact him again. *Id.*

29. On October 23, 2018, Mr. O'Connor sought a restraining order against Mr. Grisim and Comcast's workers. The Court denied Mr. O'Connor's motion the same day it was filed. *See* Ex. 7 (Oct. 23 Order).

30. On or around October 25, Mr. O'Connor appeared on television to publicly discuss his dispute with Comcast, characterizing the company as "an evil empire" and calling for the public to "stand up" against Comcast. Russel Haythorn, *Lafayette homeowner tells Comcast to buzz off over new fiber optics line*, DENVER7 (Oct. 25, 2018), https://www.thedenverchannel.com/news/contact7/lafayette-homeowner-tells-comcast-to-buzz-off-over-new-fiber-optics-line. Mr. O'Connor also reportedly took to social media to incite protest from other City residents.

31. On November 7, Comcast made a final attempt to access the Easement, but Mr. O'Connor once again refused to let Comcast onto the Property.

**Defendants' Actions Have and Continue to Irreparably Harm Comcast and Surrounding Residents**

32. Comcast currently has cable system facilities installed in the Easement at issue in this case. Comcast seeks to access those cable systems facilities in the Easement pursuant to the

6

project described above. In addition, even absent the above described project, Comcast needs access to the Easement from time to time for standard maintenance and for service outage calls.

33. Defendants' continued efforts to deny Comcast access to the Easement could cause service outages for hundreds of surrounding residents.

34. Defendants' actions have resulted in delays to Comcast's construction efforts in the area thereby resulting in Comcast incurring additional expenses.

35. Defendants' actions also have cost Comcast additional unnecessary expenses such as having to spend employee time working with the local police department and incurring the legal expenses associated with the filing of this Complaint.

36. Comcast faces competition for video, phone, and Internet services which it delivers over the cable system. Every day of delay in completion of the project impairs Comcast's ability to deliver higher levels of service to its customers and prospective customers in that neighborhood.

**FIRST CLAIM FOR RELIEF**
(Violation of the Cable Communications Policy Act of 1984)

37. Comcast incorporates by reference Paragraphs 1 through 38 above.

38. Section 541(a)(2) of the Cable Communications Policy Act of 1984, 47 U.S.C. § 541(a)(2) ("Cable Act"), states in pertinent part:

(2) Any franchise shall be construed to authorize the construction of a cable system over public rights-of-way, and through easements, which are within the area to be served by the cable system and which have been dedicated for compatible uses, except that in using such easements the cable operator shall ensure –

(A) that the safety, functioning, and appearance of the property and the convenience and safety of other persons not be adversely affected by the installation or construction of facilities necessary for a cable system;

(B) that the cost of the installation, construction, operation, or removal of such facilities be borne by the cable operator or subscriber, or a combination of both; and

(C) that the owner of the property be justly compensated by the cable operator for any damages by the installation, construction, operation, or removal of such facilities by the cable operator.

39. The Cable Act defines "franchise" as "an initial authorization, or renewal thereof. . . issued by a franchising authority, whether such authorization is designated as a franchise,

permit, license, resolution, contract, certificate, agreement, or otherwise, which authorizes the construction or operation of a cable system."

40. The Agreement between Comcast and the City authorizes Comcast to construct or operate a cable city in the City and, thus, Contract is the holder of a "franchise" under § 541(a)(2).

41. As a cable operator under § 541(b)(2), Comcast is entitled to the rights and protections afforded by the Cable Act.

42. The Rights-of-Way described in the Agreement, which include the dedicated Easement set forth in the Churchill Pointe Subdivision's Final Plat, are the types described and contemplated by § 541(a)(2).

43. Comcast is ready, willing, and able to comply with all provisions and requirements of §541(a)(2)(A)-(C).

44. Defendants have and continue to deprive Comcast of its legal right to access the Easement.

45. As a direct and proximate result of Defendants' actions, Comcast has suffered and will continue to suffer irreparable injury for which it cannot be adequately compensated in damages. Comcast will continue to suffer irreparable harm unless Defendants are enjoined and restrained by the Court from preventing Comcast from accessing the Easement.

46. Comcast has no adequate remedy at law for such injuries, consisting of the loss of the value of its business investment, business opportunities, reputation and goodwill, resulting in the loss of benefits and profits to be derived therefrom, and of profits which may not be readily ascertainable by any legal measure of damage.

## SECOND CLAIM FOR RELIEF
(Declaratory Relief)

47. Comcast incorporates by reference Paragraphs 1 through 48 above.

48. An actual controversy now exists relating to the rights and duties of Defendants and Comcast concerning access to the Easement. Specifically, Comcast contends that it is entitled to access the Easement to maintain its cable lines currently located there and to complete the upgrade project described above.

49. Comcast requests a judicial declaration of the respective rights and duties of Defendants and Comcast related to access to the Easement.

## THIRD CLAIM FOR RELIEF
(Injunctive Relief)

50. Comcast incorporates by reference Paragraphs 1 through 51 above.

51. The facts described above demonstrate that Comcast has a reasonable probability of success on the merits of this action.

52. The actions of Defendants described above have caused, and will continue to cause, irreparable harm to Comcast by denying it its right to access the Easement.

53. Comcast cannot be adequately compensated in damages for Defendants' continued effort to block Comcast's legal right to access the Easement on the Property. Indeed, if property owners, such as Defendants, could routinely deny access rights to utility easements, Comcast and other similarly-situated entities would not be able to provide services to consumers, resulting in public harm.

54. Comcast does not have a plain, speedy, and adequate remedy at law.

55. The injunctive relief sought by Comcast will not disserve the public interest. Rather, it is in the public interest to ensure that property owners do not block access to a public utility easement to the detriment of other consumers.

56. The balance of equities favors the entry of injunctive relief.

57. Injunctive relief also will preserve the status quo pending a trial on the merits.

## PRAYER FOR RELIEF

Comcast specifically requests that judgment be entered as follows:

a. Judgment against Defendants for an award of damages and attorneys' fees to Comcast in an amount to be proven at trial;

b. Entry of a preliminary injunction, after a hearing, precluding Defendants from blocking Comcast's access to the Easement; and

c. Any other relief the Court deems just and proper.

DATED: November 21, 2018.

                        BALLARD SPAHR LLP

                        By: *s/ David M. Stauss*
                            David M. Stauss, #40769
                            J. Matthew Thornton, #48803

                        **ATTORNEYS FOR PLAINTIFF COMCAST OF COLORADO I, LLC**

<u>Address of Plaintiff</u>:
1701 John F. Kennedy Boulevard
Philadelphia, Pennsylvania 19103-2838

## VERIFICATION

STATE OF COLORADO            )
                             ) SS.
CITY AND COUNTY OF DENVER    )

I, __Jon Lehmann__, of Comcast of Colorado I, LLC, being duly sworn, depose and state that I have read the foregoing VERIFIED COMPLAINT and state that no one person at the company has personal knowledge of all of the information stated therein. However, I have verified the information with Comcast employees, and to the best of my knowledge, information, and belief, the information included in the VERIFIED COMPLAINT is true and correct.

s/ _____
Jon Lehmann

STATE OF COLORADO

CITY AND COUNTY OF DENVER

Subscribed and sworn to before this 21st day of November, 2018, by __Jon Lehmann__.

Witness my hand and official seal.

My commission expires: 05/23/2022.

[SEAL]

_____
Notary Public

ELISSA PELLETIER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20184022005
MY COMMISSION EXPIRES 05/23/2022